UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEPHANIE BAIYASI,

       Plaintiff,

                                   Case Number 11-13094-BC
v.                                Honorable Thomas L. Ludington

DELTA COLLEGE and
DAVID BAILEY, individually
and in his official capacity,

       Defendants.
_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
DENYING AS MOOT DEFENDANTS' MOTION TO STAY DISCOVERY**

This dispute arises out of the ending of Plaintiff Stephanie Baiyasi's employment relationship with Defendant Delta College.  Plaintiff, formerly a professor in Delta's science department, contends that she was denied tenure and then terminated because of her religious beliefs.  Asserting that the chairman of Delta's science department, Defendant David Bailey, is biased against Christians, Plaintiff brings claims pursuant to 42 U.S.C. § 1983, Title VII, and Michigan's Elliot Larsen Civil Rights Act.  Instead of answering, Defendants move for summary judgment "pursuant to Fed. R. Civ. P. 12(b)(6) and/or 56(c)."  ECF Nos. 8, 17.  Defendants also move for a protective order staying discovery pending determination of their summary judgment motions.  ECF No. 22.  For the following reasons, the Court will grant in part and deny in part Defendants' motions for summary judgment.  The Court will deny as moot the motion for a protective order staying discovery.

**I**

Plaintiff began teaching science at Delta in 1994 as an adjunct professor.  Am. Compl. ¶ 82, ECF No. 15.  A self-identified "Christian Professor," she became "active in the campus Christian society" and "involved in campaigning to get 'creation science' as part of the curriculum."  *Id*. ¶¶ 26, 27, 31.

At some point (the complaint does not specify when), Delta promoted Plaintiff to assistant professor, a tenure-track position.  The tenure-track, the Delta College Senate Handbook provides, runs its course after seven years.  *See* Am. Compl. Ex. D, at 5.  A faculty member must obtain tenure within seven years of being placed on tenure-track or face termination.  Part 3.010 of the handbook establishes the following procedure for obtaining tenure:

1.   Individuals who are eligible for tenure will consult with their division chair. . . .

2.   The candidate will use a peer review committee.

3.   The division chair will arrange and chair a meeting of the division Faculty to consider each individual.  Within one (1) week after the conclusion of the division process, the Faculty recommendation will be determined by a vote of the division Faculty.  A positive recommendation will require at least a two-thirds (2/3) majority of those Faculty casting positive and negative votes; otherwise the recommendation will be negative.  The candidate will be notified, in writing, of the decision. . . .

4.   Refer to section I., F., items 4 through 13 of this policy.  These items also apply for tenure.

*Id*. at 6–7.  Section (I)(F), in turn, provides in pertinent part:

4.   Candidates who feel that the recommendation of the Faculty is not based on a fair consideration of all relevant factors may, within ten (10) days from the date of notification, submit a written appeal of the recommendation to the division chair.  The Faculty will arrange to meet

with the individual to reconsider their recommendation on the basis of the information contained in the appeal. . . .

5.    Upon receipt of the recommendation of the Faculty, the division chair will review and will submit the list of candidates to the appropriate academic dean with the chair's written recommendation of each individual. Each candidate will receive a copy of the Chair's recommendation regarding his or her candidacy.

6.    The chief academic officer will convene the division chairs for the purpose of reviewing recommendations. The division chairs will furnish an advisory recommendation to the appropriate academic dean. Candidates for tenure who feel that the recommendation of the division chair is not based on a fair consideration of all relevant factors may submit a written appeal of the recommendation of the Council of Chairs. The appeal will be conducted in accordance with procedures established by the Academic Office, and must be completed prior to any action on the recommendation by the dean.

7.    Upon receipt of all recommendations, the appropriate academic dean will review and submit the list of candidates to the chief academic officer with a recommendation on each candidate.

8.    Upon receipt of the list of recommendations, the chief academic officer will review the list and add recommendations on each individual to those of the appropriate academic dean and submit the list of candidates to the President. . . .

10.    Upon receipt of the list of recommendations, the President will review the list and add recommendations on each individual to those of the Chief Academic Officer and will submit the list of candidates to the Board of Trustees for final consideration. . . .

12.    The candidate and the Faculty will be advised as to the action taken by the Board of Trustees. . . .

*Id*. at 3–4.

David Bailey, as noted, is Plaintiff's division chair. The complaint alleges that "Bailey has made it clear that he has 'problems,' with Christians." Am. Compl. ¶ 28. It elaborates:

He has made statements openly to other Professors about wanting to "crush all Christians[,]" referring to them as "bugs[.]"

That it is believed that Bailey may hold some sort of Scientism beliefs or beliefs against Christianity since he has made statements impugning Christianity and those that would hold such beliefs. . . .

Bailey has described Christian Science in disgust as an "unbelievable concept[.]"

That it is also believed that Defendant Bailey as Chair of the Science Division promoted the presentation of a campus speaker that debunked "creation science" and has also expressed disrespect for the beliefs of Christians like the Plaintiff that "God created the universe[.]"

*Id*. ¶¶ 28–29, 48–49.

At some point (the complaint does not specify when), "Plaintiff complained to the Dean of Faculty, Karen Wilson, concerning the bias on the part of Defendant Bailey."   *Id*. ¶ 37.   In May 2009, "Plaintiff met again with Dean Karen Wilson to again express her concern that Defendant Bailey had exhibited hostility towards her."   *Id*. ¶ 38.   Ms. Wilson responded by telling Plaintiff to "accept David Bailey as her supervisor and to cooperate with him."   *Id*. ¶ 39. Ms. Wilson did not investigate Plaintiff's allegations.   *Id*.

When Plaintiff applied for tenure, the complaint continues, Bailey "manipulated the promotion and tenure process on the part of the Plaintiff, so as to crush any reasonable opportunity for Plaintiff to obtain tenure or continue employment at Delta."   Am. Compl. ¶ 30. Specifically, he "conducted her departmental meeting in a process that was irregular and encouraged and allowed people in attendance to make unsubstantiated and untrue statements regarding the Plaintiff in this meeting, without providing Plaintiff with an opportunity to respond to these statements."   *Id*. ¶ 40.   Moreover, "Bailey claimed Plaintiff was not acting in a 'collegial fashion.' "   *Id*. ¶ 41.   "Collegial," the complaint explains, "has religious connotations thus also underscoring his discriminatory bias."   *Id*.

-4-

On November 3, 2010, Plaintiff met with Delta's human resource director, "Tamie Grunow, and at that time made Ms. Grunow aware that Defendant Bailey had conducted her departmental meeting in a process that was irregular." *Id*. ¶ 40. Plaintiff "indicated to Grunow that she believed that Defendant Bailey was manipulating the meeting process to squeeze out any support for the Plaintiff by filling up time to discuss her readiness for tenure with what appeared to be an orchestrated effort by Defendant Bailey to raise concerns about Plaintiff rather than look at her many positive contributions." Am. Compl. ¶ 43. Ms. Grunow did not investigate. About two weeks passed.

Then, "on November 16, 2010, Plaintiff called a meeting to discuss and ask for an investigation to determine if Defendant Bailey was harboring a hidden agenda to undermine her ability to receive tenure because of her open Christian beliefs." *Id*. ¶ 44. The complaint does not identify who was present at this meeting or whether it was called pursuant to the college handbook procedure (specifically, § (I)(F)(4), quoted above).

Following the meeting, Bailey "agreed to allegedly recuse himself." *Id*. ¶ 45. Nevertheless, "Bailey wrote an extremely negative letter to the council of chairs indicating his lack of support for the Plaintiff to become tenured, in an attempt to pursued [sic] the council." *Id*.

In January 2011, the council of chairs voted on Plaintiff's tenure application. *Id*. ¶ 46. The complaint does not specify what the council recommended or whether Plaintiff challenged the recommendation. Instead, the complaint reports simply that "Defendant's actions have caused the Plaintiff to be discriminated against based upon her religious beliefs, and as such, has been [sic] denied tenure." Am. Compl. ¶ 54. Shifting to the active voice, it continues: "Defendant Bailey has also indicated that he will not be renewing Plaintiff's contract, and has

terminated the renewal of Plaintiff's contract for the 2011-2012 school year." *Id*. ¶ 55 ("Plaintiff was terminated," it also notes, "on June 30, 2011." *Id*. ¶ 91.)

On August 18, 2011, Plaintiff filed suit in this Court against Delta and Bailey. Alleging religious discrimination, Plaintiff brought claims pursuant to 42 U.S.C. § 1983 and Michigan's Elliot Larsen Civil Rights Act. Instead of answering, Defendants filed a "motion for summary judgment," brought "pursuant to Fed. R. Civ. P. 12(b)(6) and 56(c)." Defs.' Mot. Summ. J. 2, ECF No. 8 ("Defs.' Mot.").

In November 2011, Plaintiff received a right to sue letter from the EEOC. She then obtained concurrence for filing an amended complaint adding a Title VII claim. In December 2011, the Court entered a stipulated order granting Plaintiff leave to amend and granting Defendants leave to supplement their motion to address to the Title VII claim. ECF No. 14.

Plaintiff's amended complaint has four counts. ECF No. 15. Count one asserts a § 1983 claim against Delta for discriminating against Plaintiff because of her religion in violation of the First and Fourteenth Amendments. Count two asserts a claim under Michigan's Elliot Larsen Civil Rights Act against Delta and Bailey for religious discrimination. Count three asserts a second § 1983 claim, this one for violating Plaintiff's procedural due process rights. Count four asserts a claim under Title VII against both Delta and Bailey for religious discrimination.

Defendants, in turn, filed a supplemental "amended motion for summary judgment," once more brought "pursuant to Fed. R. Civ. P. 12(b)(6) and 56(c)." Defs.' Am. Mot. Summ. J. 1, ECF No. 17 ("Defs.' Am. Mot.").

Additionally, Defendants filed a motion to stay discovery pending determination of Defendants' motions for summary judgment.

For the reasons that follow, the Court will grant in part and deny in part Defendants' motions for summary judgment. The Court will deny Defendants' motion to stay as moot.

## II

## 1

Before considering the merits of the motions for summary judgment, however, the Court must determine the applicable standard of review. Put simply, are the titular "motions for summary judgment" motions for summary judgment? Or are they (their titles notwithstanding) actually motions to dismiss for failure to state a claim?

The beginnings and ends of the motions suggest the former. They begin by  titling themselves, respectively, as a "motion for summary judgment" and an "amended motion for summary judgment." And they end with exhibits, three dozen in all. Moreover, in the body of the motions, they reference Rule 56, the federal rule of civil procedure applicable to summary judgment.

Yet the motions also cite Rule 12(b)(6), applicable to motions to dismiss for failure to state a claim. Regarding the § 1983 claim, for example, it is asserted: "Failure to specifically allege a custom or policy is fatal to Plaintiff's § 1983 claim against Delta College and judgment for the Defendant on the pleadings is appropriate under Fed. R. Civ. P. 12(b)(6)." Def.'s Mot. 10–11. Moreover, the timing of the motions (filed instead of answering) also suggest that they are brought pursuant to Rule 12(b)(6).

Thus, the motions are ambiguous regarding which rule they are brought pursuant to. Exemplifying the ambiguity, the motions assert that "judgment for the Defendant[s] is required pursuant to Fed. R. Civ. P. 12(b)(6) and/or 56(c)." *Id*. at 16.

Notwithstanding Defendants' citing the two rules indiscriminately, the rules are not interchangeable.  The distinction between them is not trivial.  To illustrate, "when considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court cannot consider records or other documents outside the four corners of a plaintiff's complaint."  *Scott v. Ambani*, 577 F.3d 642, 650 (6th Cir. 2009) (McKeague, J., concurring in part and dissenting in part).  When considering a summary judgment motion under Rule 56, however, a court can consider all admissible evidence, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

Plaintiff, for her part, observes that discovery has not yet commenced in this case.  She writes:

> [I]t is inappropriate for the Court to consider the evidence referenced by the Defendant[s] when determining the sufficiency of the pleadings. . . . In the unlikely event that the Court is inclined to consider the evidence submitted by the Defendant[s] and expand the scope of Defendants' motion to a Rule 56 motion, the Plaintiff respectfully requests that the Court give notice of its intentions as required by the Federal Rules of Civil Procedure.

Pl.'s Resp.  Am. Mot. Summ. J. 3 n.2, ECF No. 19.  Plaintiff is correct.  Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Consequently, if the Court is to consider the thirty-six exhibits attached to Defendants' motions, Plaintiff "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*  Unless the exhibits are excluded, Plaintiff must be permitted to take discovery.

-8-

A review of the pleadings demonstrates that this is not necessary.  Regardless of whether the Court considers the exhibits, Defendants are entitled to judgment on Plaintiff's § 1983 claims and one of her Title VII claims (the hostile work environment claim).

In contrast, if the Court does not consider the exhibits, Defendants are not entitled to judgment on the remainder of Plaintiff's Title VII claims (her disparate treatment and retaliation claims) or her Elliott-Larsen Civil Rights Act claim.  If the Court were to consider the exhibits, the motion would have to be held in abeyance pending discovery.  Such an order, however, would result in the needless expenditure of the parties resources on baseless claims.  And it would result in the needless expenditure of this Court's resources in adjudicating another set of supplementary motions on issues previously briefed.

Accordingly, the Court will treat the motions for judgment "pursuant to Fed. R. Civ. P. 12(b)(6) and/or 56(c)" as motions brought pursuant to Rule 12(b)(6) and limit the universe of facts considered in deciding the motions to the allegations made in the amended complaint and its exhibits.

**2**

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the complaint does not state a claim upon which relief can be granted.  To withstand the motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555–56).

**III**

**A**

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," the First Amendment provides in pertinent part.  U.S. Const. amend. I. Incorporated through the Fourteenth Amendment, the First Amendment also applies to the States and their political subdivisions. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

The first count of the amended complaint seeks damages from Delta for violating Plaintiff's First and Fourteenth Amendment pursuant to 42 U.S.C. § 1983.  Section 1983, in turn, provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." *Id*.

To state a claim pursuant to § 1983, the plaintiff must establish two elements: "(1) the violation of a right secured by the federal Constitution or federal law (2) that was committed by a person acting under color of state law." *Brown v. Matauszak*, 415 F. App'x 608, 611 (6th Cir. 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  Here, the amended complaint does establish the second element.

The "person" sued in the first count is Delta, a community college that this Court has previously found to be a "political subdivision" of the state of Michigan. *Boensch v. Delta Coll.*, No. 10–10120–BC, 2011 WL 1233301, at *10 (Mar. 30, 2011) (holding Delta College is not immune from suit under the Eleventh Amendment as it is a "political subdivision" rather than an "arm" of the state); *but cf. Hall v. Delta Coll.*, No. 09–10193–BC, 2009 U.S. Dist. LEXIS 129788, at *17–18 (E.D.Mich. Dec. 15, 2009) ("[Delta] contends that the Eleventh Amendment

-10-

bars Plaintiff's § 1983 claims because nearly one-quarter of its funds come from the State of Michigan . . . .  In response, Plaintiff concedes that the Eleventh Amendment bars his § 1983 claims").

Here, Defendants do not contend that Delta is immune from suit under the Eleventh Amendment.  *See Lapides v. Bd. of Regents of Univ. of Ga.*, 535 U.S. 613, 618–19 (2002) (noting Eleventh Amendment immunity can be waived).  Rather, they contend that Plaintiff has not alleged a discriminatory custom or policy of Delta.  *See* Def.'s Mot. 10 (quoted above). For the reasons discussed below, Defendants are correct.

Section 1983, unlike Title VII, does not impose vicarious liability.   A political subdivision "cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a [political subdivision] cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [political subdivision] as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.  The "policy" may be drawn from an action of a single official, provided that the official "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (plurality opinion).

But, the Supreme Court cautions, liability is not lightly imposed on political subdivisions of the state:

> The fact that a particular official — even a policymaking official — has discretion
> in the exercise of particular functions does not, without more, give rise to . . .
> liability based on an exercise of that discretion.   The official must also be

responsible for establishing final government policy respecting such activity before the [political subdivision] can be held liable.

*Id*. at 481–82 (internal footnote and citation omitted) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–24 (1985)).  The official must "have final policymaking authority."  *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (citing *Pembaur*, 475 U.S. at 483).

 "To determine whether final authority to make . . . policy is vested in a particular official," the Sixth Circuit elaborates, "we must resort to state law," which includes "positive law, such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom."  *Feliciano*, 988 F.2d at 655 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) (plurality opinion); *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989)).

In this case, Plaintiff contends that the relevant source of law is the Bylaws of the Delta Board of Trustees.  *See* Pl.'s Resp. to Mot. Summ. J. 12, ECF No. 11 ("Pl.'s Resp.").  She observes that bylaws specify:  "The board of trustees shall . . . [d]elegate to the president of the college the board's authority to: select and employ personnel of the college."  Pl.'s Resp. Ex. 2, at 10 (internal formatting omitted).  "Accordingly," Plaintiff concludes, "Delta's President is the final decision maker with regards to the selection and employment of college personnel."  Pl.'s Resp. 12.

Although Plaintiff is correct that the college president has some authority to make employment decisions, Plaintiff is not correct that the college president is the final decision-maker regarding tenure.  Rather, Plaintiff's own exhibit (specifically, the Senate Handbook) establishes that the president is merely the fifth level of advisory review; the final decision is made by Delta's board of trustees.  *See* Am. Compl. Ex. D, at 3–4, 6–7.

The first level of advisory review occurs at the division faculty level, where the tenured faculty within the candidate's discipline vote on the application. *Id*. at 7. A two-thirds majority in support of the application is necessary for a "positive" recommendation. *Id*. Otherwise the recommendation is "negative." *Id*. The second level of advisory review occurs at the division chair level. *Id*. at 3. The division chair receives the recommendation of the division faculty, makes his own advisory recommendation, and forwards both recommendations to the appropriate academic dean. *Id*. The academic dean, in turn, convenes the chairs of all the divisions (the "council of chairs"), who engage in a third level of advisory review. *Id*. at 3–4. The recommendation of the council of chairs is then sent to the appropriate academic dean, who submits the recommendation to the chief academic officer. *Id*. at 4. The chief academic officer conducts a fourth level of advisory review, making recommendations on the candidates and sending the applications on to the college president. *Id*.

The college president conducts a fifth level of advisory review. *Id*. "Upon receipt of the list of recommendations," Delta's handbook provides, "the President will review the list and add recommendations on each individual to those of the Chief Academic Officer and will submit the list of candidates to the Board of Trustees for final consideration." *Id*. The president's decisions regarding tenure are thus neither unreviewable nor final. The president is not the "final decision maker" regarding tenure; rather, the president is the "final recommender." The board of trustees is the "final decision maker." Count one of Plaintiff's amended complaint does not state a claim on which relief can be granted.

**B**

Count three of the amended complaint, a procedural due process claim, similarly does not state a claim on which relief can be granted. Implicitly acknowledging as much, Plaintiff writes

that she "is willing to stipulate to the dismissal of her due process claims as against all the named Defendants." Pl.'s Opp'n 3. Accordingly, Defendants are entitled to judgment on this count as well.

<div align="center">

**C**

</div>

The remaining two counts of the amended complaint (counts two and four) assert claims of religious discrimination under Title VII and the Elliott-Larsen Civil Rights Act (ELCRA). For analytical purposes, the ELCRA resembles federal law and the same general evidentiary burdens prevail as in Title VII cases. *See In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172–73 (1998). Accordingly, the two counts are considered together.

"It shall be an unlawful employment practice for an employer," Title VII provides in pertinent part, "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).[1] This prohibition encompasses not only "economic or tangible discrimination," but "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

---

[1] "An employer shall not," the Elliott-Larsen Civil Rights Act similarly provides, "discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion." Mich. Comp. L. § 37.2202(1)(a).

Here, although not explicitly enumerated as such, it appears that Plaintiff is asserting a hostile work environment claim,[2] a disparate treatment claim, and a retaliation claim.

**1**

A hostile work environment exists when, under the totality of the circumstances, "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bourini v. Bridgestone/Firestone*, 136 F. App'x 747, 751 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

The court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Burdette v. Fed. Express Corp*., 367 F. App'x 628, 633 (6th Cir. 2010) (internal alteration omitted) (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Bourini*, 136 F. App'x at 751 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). For example, "[a] hostile work environment is not shown by stray, isolated or ambiguous comments." *Hegwood v. Pharmacia/Upjohn*, 985 F. Supp. 728, 733 (W.D. Mich. 1997)). Moreover, to state a claim the conduct must be both objectively and subjectively severe and pervasive. *Harris*, 510 U.S. at 21–22.

---

[2] *See, e.g.*, Am. Compl. ¶ 37–38 ("Plaintiff complained to the Dean of Faculty, Karen Wilson, concerning the bias on the part of Defendant Bailey and that Plaintiff did not want to work in a hostile work environment with him . . . . [O]n May 6, 2009, Plaintiff met again with Dean Karen Wilson to again express her concern that Defendant Bailey had exhibited hostility towards her and that she had concerns that she was being asked to continue to work in a hostile work environment.").

In this case, Plaintiff's hostile work environment claim is based on four specific discriminatory comments.  First, Bailey "made statements openly to other Professors about wanting to 'crush all Christians' referring to them as 'bugs.' "  Am. Compl. ¶ 28.  Second, "Bailey claimed that Plaintiff was not acting in a 'collegial fashion.' "  *Id*. ¶ 41.  Third, he "promoted the presentation of a campus speaker that debunked 'creation science.' "  *Id*. ¶ 49.  And fourth, "Bailey has described Christian Science in disgust as an 'unbelievable concept.' "  *Id*. ¶ 48.

Of these four comments, the most objectively offensive is Bailey's alleged statement "about wanting to 'crush all Christians' referring to them as bugs."  *Id*. ¶ 28.  Plaintiff concedes, however, that Bailey never made such a remark to her.  Rather, she explains, "it was brought to my attention by Dr. Loretta Sharma (Holtman), a member of Delta's faculty, [who said that] David Bailey had shared with her his desire to crush Christians like a bug."  Pl.'s Aff. ¶ 4, *attached as* Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. 1.

As a general matter, "comments to co-workers outside of the plaintiff's presence" are less objectively severe than those "aimed directly at [the plaintiff]."  *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006) (citing *Whittaker v. N. Ill. Univ.*, 424 F.3d 640 (7th Cir. 2005)).  A plaintiff's learning of an offensive comment via a sympathetic intermediary is not as severe as having a supervisor make the offensive comment directly to the plaintiff.[3]  The

---

[3] Defendants correctly observe that this statement is hearsay.  To be more precise, it presents a classic example of a potential "double-hearsay" problem involving two out-of-court statements.  *Cf.* Fed. R. Evid. 805.  Defendants are correct that on summary judgment the Court may only consider "admissible evidence."  *Meirthew v. Amore*, 417 Fed. App'x 494, 496 n.2 (6th Cir. 2011) (citing Fed. R. Civ. P. 56(c)(2)).  But, as noted, the Court is not treating Defendants' motions as motions for summary judgment, but as motions to dismiss for failure to state a claim.  On a motion to dismiss for failure to state a claim, the Court must accept all factual allegations as true, regardless of whether they are presented in a form that would comply with the Federal Rules of Evidence. *Cf. JHohman, LLC v. Sec. Assoc., Inc.*, 513 F. Supp. 2d 913, 920 (E.D. Mich. 2007) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 512 (6th Cir. 2001)).

"severity" of this single remark made outside Plaintiff's presence is not sufficient to create an abusive working environment. Likewise, although offensive, it was not physically threatening or humiliating. Plaintiff does not suggest, for example, that she felt physically threatened or humiliated by the comment. Moreover, Plaintiff does not allege that the comment unreasonably interfered with her work performance. On the contrary, she asserts that her performance was exemplary throughout the course of her employment. *E.g.*, Am. Compl. ¶ 33 ("Plaintiff, throughout the course of her employment with Delta College, did proceed without incident and worked in a satisfactory manner.").

Next, Plaintiff alleges that Bailey purportedly told Plaintiff that she was not acting in a "collegial" manner, a term which she asserts has "religious connotations." Compl. ¶ 41. Plaintiff is correct that "collegial," like its etymological cousin "college,"[4] has a religious connotation in some contexts (describing the relationship between the members of the Catholic Church's Sacred College of Cardinals, for example). But the more common, secular connotation, is the relationship between colleagues. When a supervisor tells an employee that she should act in a more "collegial" manner, the ordinary implication is not that the statement is motivated by religious animus. Rather, it appears to express a common concern of workplace supervisors everywhere — that an employee should make an effort to get on better with her colleagues. After drawing all reasonable inferences in Plaintiff's favor, the "collegial" statement is too ambiguous to support a hostile work environment claim.

---

[4] "Collegial," from the Latin *collēgium* ("colleagueship, partnership, hence a body of colleagues, a fraternity"), is generally defined as "of or belonging to a college . . . or to a body of persons associated as colleagues in the performance of any function." *Online Oxford English Dictionary*, http://www.oed.com/view/Entry/36302.

Similarly, Bailey's presentation of a campus speaker challenging "creation science," although again interpreted as evidence of religious discrimination by Plaintiff, is not objectively discriminatory conduct. Plaintiff does not contend that the presentation was physically threatening or humiliating. Plaintiff does not contend that an impartial observer would find the presentation offensive, much less extremely offensive. Likewise, Plaintiff does not explain how hosting a speaker with a different scientific viewpoint unreasonably interfered with her work performance. Rather, as noted, Plaintiff contends that her performance was exemplary throughout the course of her employment.

Finally, Bailey's rejection of creation science as "unbelievable concept," although again interpreted as evidence of religious discrimination by Plaintiff, is not objectively discriminatory conduct. The Constitution protects Plaintiff's right to freely exercise her beliefs and, moreover, to communicate them to her peers. However, the Constitution also protects Bailey's right to do the same. Simply alleging a difference of opinion, whether religious, scientific, or otherwise, does not state a claim for a constitutional violation.

Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim.

**2**

Next, Plaintiff alleges that she was denied tenure and then terminated because of her religion. Defendants respond that they are entitled to judgment on this claim because Plaintiff's complaint "fails to plead a prima facie case of religious discrimination." Defs.' Am. Mot. Summ. J. 1 (capitalization omitted). Specifically, Defendants assert that under *McDonnell Douglas* "Plaintiff has pled facts to support elements one and two but has failed to plead facts supporting elements three and four." *Id*. at 6 (citing *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1973)).  Defendants' legal argument — that to survive a motion to dismiss a plaintiff must plead facts establishing each element of the prima facie case under *McDonnell Douglas* — is contrary to precedents of both the Supreme Court and the Sixth Circuit.

As noted, under Rule 12(b)(6) a defendant bears the burden of demonstrating that the complaint does not state a claim upon which relief can be granted.  To withstand the motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A complaint need not, however, plead facts establishing each element of the prima facie case under *McDonnell Douglas*.  *Lindsay v. Yates*, 498 F.3d 434, 439 (6th Cir. 2007) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).  "The prima facie case under *McDonnell Douglas*," the Supreme Court explains, "is an evidentiary standard, not a pleading requirement."  *Swierkiewicz*, 534 U.S. at 510.  "Before discovery has unearthed relevant facts and evidence," the Court continues, "it may be difficult to define the precise formulation of the required prima facie case in a particular case.  Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases."  *Id*. at 512.

Moreover, notwithstanding the tension between *Swierkiewicz* and the subsequent decisions in *Twombly* and *Iqbal*, the Sixth Circuit holds that *Swierkiewicz* remains good law, explaining: "*Swierkiewicz* was discussed extensively by the dissent in the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*. . . .  Because the Supreme Court majority distinguished *Swierkiewicz* and nowhere expressed an intent to overturn it, we have no basis for concluding that *Swierkiewicz* is no longer good law."  *Lindsay*, 498 F.3d at 440 n.6.

-19-

In this case, the complaint contains sufficient factual matter to state a claim of disparate treatment that is plausible on its face. It alleges that Defendants treated Plaintiff unfavorably because of her religious beliefs. Illustrating Bailey's discriminatory conduct, the amended complaint alleges:

> [Bailey] has manipulated the promotion and tenure process on the part of the Plaintiff, so as to crush any reasonable opportunity for Plaintiff to obtain tenure or continue employment at Delta. . . .
>
> [Specifically, he] conducted her departmental meeting in a process that was irregular and encouraged and allowed people in attendance to make unsubstantiated and untrue statements regarding the Plaintiff in this meeting, without providing Plaintiff with an opportunity to respond to these statements. . . .
>
> [Thus,] Bailey was manipulating the meeting process to squeeze out any support for the Plaintiff by filling up time to discuss her readiness for tenure with what appeared to be an orchestrated effort by Defendant Bailey to raise concerns about Plaintiff rather than look at her many positive contributions as set forth by the Plaintiff. . . .
>
> [W]hen Bailey was confronted with these statements he did not deny them but instead, agreed to allegedly recuse himself from the role. However, and in further retaliation for this "recusal" Bailey wrote an extremely negative letter to the council of chairs indicating his lack of support for the Plaintiff to become tenured, in an attempt to pursued [sic] the council.
>
> That his actions were meant to, and did, "poison the well" so-to-speak and provided an unfavorable reception by the Council of Chairs when Plaintiff's requested tenure was voted on by the chairs . . . .
>
> Bailey has also indicated that he will not be renewing Plaintiff's contract, and has terminated the renewal of Plaintiff's contract for the 2011-2012 school year.

Am. Compl. ¶¶ 30, 40, 43, 45–46, 55.

Accepting these factual allegations as true, the amended complaint sets forth a plausible claim of religious discrimination. The factual predicate of the claim is that Bailey rigged Plaintiff's tenure bid to fail and fired her after it did. Specifically, he organized opposition to Plaintiff among the science department faculty. This group dominated the departmental meeting

conversation with criticism, resulting in a negative recommendation. Following the meeting, Bailey wrote a letter recommending that Plaintiff not be given tenure. And he did all of this because of his discriminatory animus towards practicing Christians. Because these allegations are sufficient to apprise the Defendants of Plaintiff's claim of disparate treatment and the grounds upon which the claim rests, Plaintiff has satisfied her pleading burden.

Arguing against this conclusion, Defendants assert "Plaintiff's complaint fails to meet the pleading standards set forth by the U.S. Supreme Court in [*Twombly* and *Iqbal*,] which require that the Complaint contain sufficient factual allegations to plausibly suggest Defendant[s'] discriminatory state of mind not just conclusory legal allegations based solely upon the Plaintiff's 'belief' that Bailey held an anti-Christian bias." Def.'s Reply to Mot. Summ. J. 5, ECF No. 13. Defendants read the allegations of the amended complaint too narrowly. While the amended complaint does make the conclusory statement that "it is believed that Bailey may hold some sort of Scientism beliefs or beliefs against Christianity," the amended complaint supports its allegation by further asserting:

> He has made statements openly to other Professors about wanting to "crush all Christians[,]" referring to them as "bugs" . . . .
>
> [H]e has made statements impugning Christianity and those that would hold such beliefs. . . .
>
> Bailey has described Christian Science in disgust as an "unbelievable concept[.]"
>
> [He] has also expressed disrespect for the beliefs of Christians like the Plaintiff that "God created the universe[.]"

Am. Compl. ¶¶ 28–29, 48–49. These factual allegations, if true, could reasonably give rise to an inference of discriminatory animus. Defendants are not entitled to judgment on Plaintiff's Title VII and ELCRA claims of disparate treatment.

**3**

Finally, Defendants assert that they are entitled to judgment on Plaintiff's retaliation claim because she has not introduced evidence supporting a causal nexus between her protected statements and the adverse employment action.  Defendants write:

> The Plaintiff alleges that she was denied tenure in response to the fact that she had complained about Bailey's alleged religious discrimination to Human Resources and to the President of the College.  The performance issues and lack of collegiality which ultimately formed the basis for the Council of Chairs' last decision to deny the Plaintiff tenure were first identified by the Council of Chairs prior to Mr. Bailey becoming Chair of the Science Division and prior to her alleged internal complaints. Since these issues were identified before the internal complaints it is impossible for the complaints to have caused the final denial of tenure which was based on previously identified issues that the Plaintiff did not successfully address.

Defs.' Am. Mot. 10.  Premised on evidence outside the complaint and its exhibits (namely, "the basis for the . . . decision to deny the Plaintiff tenure"), Defendants' argument is not proper on a motion to dismiss for failure to state a claim.

When the inquiry is limited to the allegations in the amended complaint, Plaintiff pleads all four elements of a claim of retaliation (indeed, Defendants concede the first three).  "To establish a prima facie case of retaliation pursuant to Title VII, a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) the defendant knew he engaged in this protected activity; (3) thereafter, the defendant took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004) (citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004)).

First, Plaintiff engaged in a protected activity when she repeatedly complained about Bailey's alleged religious discrimination to the human resources department, to the dean, and

later, to the president.  *E.g.*, Am. Compl. ¶¶ 37–40, 90.   On receiving these complaints, Defendants knew that Plaintiff was engaging in a protected activity.  *See, e.g.*, *id.* ¶ 45 ("[W]hen Bailey was confronted with these statements he did not deny them but instead, agreed to allegedly recuse himself.").   Later, Defendants took several adverse employment actions against Plaintiff.  "Bailey wrote an extremely negative letter to the council of chairs indicating his lack of support for the Plaintiff to become tenured."  *Id.*   The letter worked; Plaintiff was denied tenure.  She met with the president to complain of the discrimination in May 2011.  *Id.*  ¶ 90. The following month, she was terminated.  *Id.* ¶ 91.

The amended complaint, moreover, alleges a causal nexus between her protected statements and these adverse employment actions:

> [W]hen Bailey was confronted with [Plaintiff's complaints about his discriminatory] statements he did not deny them but instead, agreed to allegedly recuse himself from [his] role [in her tenure application].   However, and in further  retaliation for this "recusal"  Bailey wrote an extremely negative letter to the council of chairs indicating his lack of support for the Plaintiff to become tenured, in an attempt to pursued [sic]the council.

*Id.* ¶ 45.  As noted, the amended complaint alleges that the letter worked — setting into motion a series of events that culminated in Plaintiff's termination.   In substance, a cat's paw theory of discrimination is alleged.    Bailey manipulated the college like the monkey in the fable manipulated the cat:

> In the fable of the cat's paw (a fable offensive to cats and cat lovers, be it noted), a monkey who wants chestnuts that are roasting in a fire persuades an intellectually challenged cat to fetch the chestnuts from the fire for the monkey, and the cat does so but in the process burns its paw.   In employment discrimination law the "cat's paw" metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.  So if for example the subordinate has told the supervisor that the employee in question is a thief, but as the subordinate well

> knows she is not, the fact that the supervisor has no reason to doubt the truthfulness of the accusation, and having no doubt fires her, does not exonerate the employer if the subordinate's motive was discriminatory.

*Cook v. IPC Int'l. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, J.).

Because Plaintiff complained about Bailey's discriminatory animus towards Christians, the amended complaint alleges, he "manipulated the promotion and tenure process on the part of the Plaintiff, so as to crush any reasonable opportunity for Plaintiff to obtain tenure or continue employment at Delta."   Am. Compl. ¶ 30.   Plaintiff has established a prima facie case of retaliation.

## IV

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 8) and amended motion for summary judgment (ECF No. 17) are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Defendants' motion regarding count one of Plaintiff's amended complaint is **GRANTED** and count one is **DISMISSED**.

It is further **ORDERED** that Defendants' motion regarding count two of Plaintiff's amended complaint is **GRANTED IN PART AND DENIED IN PART** and that the hostile work environment claim is **DISMISSED**.

It is further **ORDERED** that Defendants' motion regarding count three of Plaintiff's amended complaint is **GRANTED** and count three is **DISMISSED**.

It is further **ORDERED** that that Defendants' motion regarding count four of Plaintiff's amended complaint is **GRANTED IN PART AND DENIED IN PART** and that the hostile work environment claim is **DISMISSED**.

It is further **ORDERED** that Defendants' motion to stay discovery (ECF No. 22) is **DENIED AS MOOT**.

It is further **ORDERED** that the hearing scheduled for Wednesday, May 9, 2012, at 11:00 a.m., is cancelled because the parties' papers provide the necessary factual and legal information to decide the motion. *See* E.D. Mich. L.R. 7.1(f)(2).

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 10, 2012

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 10, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>